UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JASON G. CARTER, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:23-cv-01048-SEB-MKK |
| | ) |
| THE HEALTH AND HOSPITAL | ) |
| CORPORATION OF JOHNSON COUNTY | ) |
| D/B/A JOHNSON MEMORIAL HOSPITAL, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Now before the Court are Plaintiff's Motion for Summary Judgment [Dkt. 63] and Defendant's Cross Motion for Summary Judgment [Dkt. 68]. Plaintiff Jason G. Carter, M.D. ("Dr. Carter"), has brought this action against his former employer, Defendant Johnson Memorial Hospital d/b/a Johnson Memorial Health, improperly named as Health and Hospital Corporation of Johnson County, d/b/a Johnson Memorial Hospital (the "Hospital"), alleging that Defendant discriminated against him based on his disability, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, as amended by the ADA Amendments Act of 2008 ("ADAAA"), when it terminated his employment. For the reasons detailed below, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

**Factual Background**

On October 1, 2020, Dr. Carter was employed by the Hospital as the Medical Director of Anesthesia and as a practicing anesthesiologist. Carter Decl. ¶ 1; Carter Dep.

1

at 23–24.  Chip Johnson, then the Vice President of Physician Services at the Hospital, served as Dr. Carter's direct supervisor.  Carter Dep. at 23.  Dr. David Dunkle, the Hospital's CEO and Vice President of Medical Affairs, together with the Hospital's Human Resources Department, made all employment decisions on behalf of the Hospital.  Dunkle Dep. at 11–13; 20.

Prior to Dr. Carter's hiring by the Hospital, he had disclosed to Mr. Johnson during the interview process that, approximately seven years earlier, he had received treatment[1] for a substance abuse disorder but had been sober since receiving that treatment.  Dr. Carter also disclosed in writing his prior addiction history on his "candidate submission form" and as a part of the credentialing process.  Johnson Dep. at 26–27, 76; Carter Dep. at 15–16, 21–22.  Mr. Johnson recalls that in some fashion he shared this information with Dr. Dunkle as well.  Johnson Dep. at 26–27.

Once hired, Dr. Carter's job responsibilities included providing anesthesia services to patients and overseeing the entire hospital Anesthesiology Department, along with other duties.  Carter Dep. at 24–25.  Dr. Dunkle testified that, prior to the events that culminated in Dr. Carter's termination, Dr. Dunkle had no concerns "at all" about Dr. Carter's performance.  Dunkle Dep. at 33.  In fact, in 2021, Dr. Carter earned a quality bonus for his work pursuant to Physician Employment Agreement with the Hospital.  Carter Decl. ¶ 3.

---

[1] Dr. Carter apparently received multiple forms of treatment, including therapy, weekly recovery meetings, injections, and oral medications.  Carter Dep. at 15–18.

In conjunction with his supervisory responsibilities as Medical Director of Anesthesia, Dr. Carter made certain changes within the department in an effort to improve efficiency.  He addressed various issues with departmental employees, including their "leaving early," "slow turnover," "slow performance" of epidurals and other nerve blocks, and poor "attitude."  Carter Dep. at 27-28; Johnson Dep. at 36–38.  Some staff members, particularly, the Certified Registered Nurse Anesthetists ("CNRAs"), were allegedly resistant to these changes and performance critiques and complained about Dr. Carter's communication style when he first entered on duty.  Johnson Dep. at 33–34; 76–77.  According to Dr. Johnson, Dr. Carter managed to successfully improve his communication style in response to such complaints.  Johnson Dep. at 34.

Dr. Carter also sought to deal with what he discovered to be employees' gossiping about his prior substance abuse disorder.  Another physician working in pain management, Dr. Vincent Gathings, had learned of Dr. Carter's past and informed other employees in the Hospital's Anesthesia Department about his addiction history.  Dunkle Dep. at 23–24.  When Dr. Dunkle learned of these conversations, he directed Mr. Johnson to speak with Dr. Gathings to ensure that Dr. Gathings knew that Dr. Carter had undergone "a prevention practice" and that Dr. Gathings reinforced the importance of "hav[ing] respect throughout the medical staff for our peers."  Dunkle Dep. at 23-24.  Despite management's intervention, Dr. Gathings apparently continued to recount details of Dr. Carter's addiction history with other employees in the Hospital's Anesthesia Department.  Dkt. 64-5 at 000297.

According to Dr. Carter, Dr. Gathings's gossip led to complaints in February 2021 and again in early September 2021 by employees in the Hospital's Anesthesia Department who reported "concerning trends with narcotics and Dr. Carter" as well as Dr. Carter's "erratic" behavior "at times" and his alleged overall lack of trustworthiness. Dkt. 64-2 at 000286–287; Dkt. 64-5 at 000296–297; Dkt. 64-4 at 000289–90; Johnson Dep. at 119–120; DeNardin Dep. at 73–74. Mr. Johnson attempted to investigate these various complaints, and, although he was not able to substantiate them all, the Hospital in response began "actively monitoring" of Dr. Carter due to the concerns raised by his coworkers. Dkt. 64-5 at 000296. The Hospital did not discuss these concerns with Dr. Carter. Carter Decl. ¶ 21.

Part of Dr. Carter's role as the Medical Director of Anesthesia, required him to work with the Hospital's Pharmacy Department to improve the auditing process for controlled substances within the Anesthesia Department by increasing the frequency and regularity of the audits.[2] Carter Dep. at 30–34; Johnson Dep. at 41–43; DeNardin Dep. at 52–54. Medical providers at the Hospital who were authorized to access controlled substances for patients were required to document the amounts they pulled for the patient, the amounts used, and the amounts wasted, if any. Johnson Dep. at 56; DeNardin Dep. at 40–41. Regardless of the specific type of controlled substances, the amounts used, combined with the amounts wasted, should always equal the amounts pulled, and, if the

---

[2] According to Dr. Carter, prior to his involvement in the development of the auditing procedures, the Hospital had not audited controlled substances discrepancies for approximately ten years. Carter Dep. at 30.

amounts do not match, it is recorded as a discrepancy. Carter Dep. at 37; Johnson Dep. at 45–46, 56. Dr. Carter worked with the Hospital to develop a strategy of next steps for medical providers whose discrepancies following an audit were determined to exceed a certain level of inaccuracy, including criteria for when to drug test the individual medical providers. Carter Dep. at 38–39.

On September 21, 2021, the Hospital sent notice to the anesthesia providers that it would be conducting a department-wide controlled substances audit, informing them that any providers who had discrepancies greater than that of their peers would be subjected to drug testing. Johnson Dep. at 50–52; Dkt. 70-4 at 000152–159. The audit was prompted by what had come to light as "obvious issues" by the Hospital in its review of controlled substance deficiencies during the period from May through September 2021, coupled with specific issues that had been raised specifically regarding Dr. Carter's actions. Dkt. 70-4.

The Hospital's September 21 audit was conducted as scheduled and revealed that two providers—a CRNA and Dr. Carter—had experienced discrepancies which were out of range of those relating to their peers. Johnson Dep. at 50–53; Dkt. 70-4 at 000152–159; DeNardin Dep. at 67. Dr. Carter's review of the audit results, caused him to believe that his discrepancies were traceable through a cross-reference of the medical records, which he claims the Hospital did not perform. Carter Dep. at 42–49; Carter Decl. ¶ 15. The Hospital, however, has adduced evidence showing that, as part of the audit procedure, representatives from the Hospital did perform a cross-referencing analysis of the controlled substance records with medical records in an effort to determine whether

5

the discrepancies could not be explained on the basis of errors in the documentation. DeNardin Dep. at 40–44; Dkt. 72-7 (Request for Prod. No. 44); Def.'s Exh. H at 000167–274.  In any event, Dr. Carter raised no concerns about the accuracy of the audit results at that time.

Both Dr. Carter and the CRNA voluntarily submitted to drug testing following the audit.  On September 22, 2021, Dr. Johnson accompanied the CRNA to his drug test, which test results came back negative.  Johnson Dep. at 53; Van Remortel Dep. at 33. The next day, on September 23, 2021, Dr. Johnson accompanied Dr. Carter to his drug test.  Dr. Carter's test results came back "non-negative."  Johnson Dep. at 54, 58–60; Van Remortel Dep. at 26–27, 38, 48–49; Dkt. 70-5.  That finding was then sent to Alere Lab for confirmation testing.  Van Remortel Dep. at 49.  Alere found a concentration of 3323 mg/mL of hydromorphone in the sample, which amount was above the 2000 ng/mL screening cutoff, as well as 921 n/mL of hydrocodone, which amount was below the cutoff for a positive sample.  Dkt. 76-3.  Hydromorphone, or Dilaudid, was one of the drugs that had discrepancies in the audit.  Van Remortel Dep. at 32; Dunkle Dep. at 34.

Maureen Huff, M.D., who worked as the Hospital's Medical Review Officer ("MRO") at this time, was a trained physician and certified MRO.  At the time of Dr. Carter's termination of employment, she had been working as an MRO for approximately fifteen years.  Huff Dep. at 14–16, 79–80.  Among her duties as the Hospital's MRO, Dr. Huff reviewed drug screens to verify results and intervened with individuals who received positive tests.  *Id.*  Throughout the relevant time period, Dave Van Remortel, a

6

Board Certified Adult Nurse Practitioner ("NP"), worked as Dr. Huff's MRO Designee or Assistant.  Van Remortel Dep. at 17; Huff Dep. at 15.

Under the Hospital's Substance Abuse Policy in effect at the time of the events underlying this litigation, the position of MRO was filled by "a licensed physician (designated by Johnson Memorial Hospital Administration) who has knowledge of substance abuse disorders and the appropriate medical training to interpret and evaluate all positive test results together with an individual's medical history and any other relevant biomedical information."  Dkt. 64-1 at 000346.  The MRO is responsible to "determine[]" whether there is "no legitimate medical explanation for a confirmed positive test result, other than the unauthorized use of a prohibited drug …."  *Id.*  Once the MRO makes a determination, the MRO or her designee notifies the Human Resources Director, who, in turn, notifies the employee of the positive test result and the employee's option to have the original sample retested.  *Id.*  Apart from the option for a retest, the Substance Abuse Policy does not explicitly provide the employee with any right to a second opinion or review of the MRO's determination that a positive test result has no legitimate medical explanation other than prohibited drug use.  The Hospital's Substance Abuse Policy provides only that, "[e]mployees having verified positive test results for a reasonable cause … drug test will be discharged."  *Id.* at 000349.

On September 30, 2021, NP Dave Van Remortel and Dr. Huff received and reviewed Dr. Carter's toxicology report, which results showed hydromorphone above the screening cutoff level of 2000 ng/ml.  Huff Dep. at 33–36; Dkt. 76-3.  In view of these results, NP Van Remortel telephoned Dr. Carter to inquire whether Dr. Carter had been

7

hospitalized or prescribed any pain medication which could explain the positive drug test results. Van Remortel Dep. at 30. Dr. Carter informed NP Van Remortel that he believed his drug test results reflected a prescription that he had recently received for hydrocodone. *Id.* at 30–32.

According to Dr. Carter, he had expected the non-negative drug test because, on September 22, that is, the day before the test, he had consulted with a podiatrist, Dr. Joshua Fisher, regarding foot pain that he had been experiencing for nearly a month, and which had caused him to begin limping. Carter Decl. ¶¶ 8, 9, 17; Carter Dep. at 71. Dr. Fisher took X-rays and diagnosed Dr. Carter with a bone spur, and put Dr. Carter in a walking boot. He gave Dr. Carter a steroid injection and prescribed him Medrol as well as Vicodin, which is Hydrocodone-Acetaminophen.[3] Carter Decl. ¶ 9; Dkt. 64-23 at 000004. Dr. Carter wore the boot for several weeks, including while working at the Hospital. Carter Decl. ¶ 9. He filled the prescription for Vicodin the same day that it was prescribed and went in for his hospital-mandated drug test the following day. *See* Carter Decl. ¶ 9, 17.

In response to NP Van Remortel's request for a record of the prescription issued by Dr. Fisher, Dr. Carter provided photographs of his hydrocodone prescription bottle. Dkt. 70-7. NP Van Remortel then contacted Dr. Huff and told her about Dr. Carter's toxicology report and his hydrocodone prescription as well as the photographs that Dr. Carter had provided of the prescription bottle, rather than the prescription itself. Dr. Huff

---

[3] Before obtaining the prescription, Dr. Carter apparently did not inform Dr. Fisher of his prior substance abuse disorder. Carter Dep. at 56–58.

reviewed the information and made an initial determination that, because Dr. Carter's drug test result was positive for hydromorphone, it could not be explained by Dr. Carter's prescription for a different drug, hydrocodone.

Later that same day, on September 30, 2021, Dr. Huff phoned Dr. Carter to discuss the test results, at which time Dr. Carter informed her that his hydromorphone levels could be explained by his prescription for hydrocodone because hydrocodone is metabolized as hydromorphone. Huff Dep. at 31–34, 56–57; Carter Dep. at 71–73. Dr. Huff determined that Dr. Carter's explanation was not supported by the medical/scientific evidence because she understood hydromorphone to be a "minor metabolite" of hydrocodone. Huff Dep. at 31–34, 56–57. Thus, Dr. Huff did not believe that the drug readings would have shown up at the recorded level in Dr. Carter's sample if it were in fact merely metabolized hydrocodone. *Id.* She concluded that Dr. Carter's hydrocodone prescription "didn't explain the minor metabolite, the hydrocodone metabolite [did] not explain [Dr. Carter's] test …[and] [did] not negate the result," (*id.* at 34) because she "wouldn't consider a metabolite at that level to give the result of the positive hydromorphone at that level." *Id.* at 65–66. Accordingly, Dr. Huff contacted NP Van Remortel and informed him that Dr. Carter's test was verified positive. Van Remortel Dep. at 33, 54–55. At the time she made this determination, Dr. Huff had never met Dr. Carter and had no knowledge that he had previously dealt with a substance abuse disorder. Huff Dep. at 31, 77.

After speaking with Dr. Huff, Dr. Carter "immediately started researching" the issue and "found out really quickly that … it's very common to test positive for

9

hydromorphone while taking hydrocodone." Carter Dep. at 72. Dr. Carter contacted Dr. Huff, informing her that he had found "several articles" warning that, "when testing for hydrocodone, … you have to be careful for false-positives for hydromorphone." *Id.* Dr. Huff maintained her position that Dr. Carter's hydrocodone prescription could not explain the level of hydromorphone that was in his sample.

Dr. Carter also provided Mr. Johnson with the medical literature that he had found to support his theory that hydrocodone metabolizes as hydromorphone and asked for a "second opinion" to "have somebody else look at the information because [he] felt that Dr. Huff was wrong." Carter Dep. at 72–73. Mr. Johnson declined, informing Dr. Carter that the Hospital did not "do second opinions." *Id.* at 73. Mr. Johnson, in turn, shared this information with Dr. Dunkle. Dr. Dunkle testified that he believed the medical literature provided by Dr. Carter was outdated because while "in the past, … you could not tell the difference between hydrocodone and hydromorphone on some drug tests[,]" current drug testing "is much more sensitive" and can now "tell the difference." Dunkle Dep. at 29–30. He further testified that any amount of hydromorphone in a drug test "would be a red flag" for him. *Id.* at 31.

After being told that Dr. Carter's positive drug test had been certified by the MRO, Dr. Dunkle directed Mr. Johnson to "make sure everything is in line with human resources, and [determine] what is their recommendation" because he knew that the Hospital had "policies that would require termination." *Id.* at 25. Mr. Johnson reported back that Human Resources "says that [the Hospital] should terminate" and Dr. Dunkle said, "okay." *Id.*

10

On October 1, 2021, Mr. Johnson and the Hospital's Human Resources Director, Judy Ware, phoned Dr. Carter to inform him that the Hospital was terminating his employment because of the positive drug test results that showed the presence of hydromorphone. According to Dr. Carter, the Hospital never provided him with a copy of the results of his drug test, a copy of the Substance Abuse Policy,[4] or a termination letter, as he requested. Additionally, although the Substance Abuse Policy required "[t]he Human Resources Director or his/or designee" to "notify" Dr. Carter "of the positive test results and his … option to have the original sample retested," (Dkt. 64-1 at 000346), he was never provided such notification, and no retest of the sample ever occurred. Carter Decl. ¶ 20.

On June 15, 2023,[5] Dr. Carter timely filed this lawsuit after receiving his Notice of Right to Sue letter from the Equal Employment Opportunity Commission, alleging that he was terminated because of his disability, to wit, his prior substance abuse disorder, in violation of the ADA, as amended by the ADAAA. Now before the Court are the parties' cross-motions for summary judgment, which are fully briefed and ripe for ruling.

## **Legal Analysis**

### I.     **Summary Judgment Standard**

---

[4] Dr. Carter signed a Hospital form, however, acknowledging that he had "been provided a copy and ha[d] received education on [the Hospital]'s Substance Abuse Policy" and "had an opportunity to ask questions about its contents." Dkt. 76-6.

[5] The parties have submitted evidence regarding events postdating Dr. Carter's termination, much of which involves confidential health information. Because none of this information was known to the Hospital at the time of Dr. Carter's termination, we neither consider it nor recount it here as it could not have influenced the Hospital's termination decision.

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

Where, as here, the parties have filed cross-motions for summary judgment, "courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." *Kohl v. Ass'n. of Trial Lawyers of Am.*, 183 F.R.D. 475 (D.Md.1998). Thus, in determining whether genuine and material factual disputes exist in this case, the Court has considered the parties' respective memoranda and the exhibits attached thereto, and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

## II.     Discussion

Dr. Carter maintains that the Hospital discriminated against him based on his disability, to wit, his former substance abuse disorder, in violation of the ADA, as amended by the ADAAA, when it terminated him following a positive drug test result.

To establish a claim of disability discrimination under the ADA, a plaintiff must prove that: (1) he is disabled as defined by the ADA; (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) he has suffered an adverse employment action because of his disability. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013). Dr. Carter has indicated that he is proceeding under the framework for evaluating discrimination set forth in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). Under *Ortiz*, "at [the summary judgment] stage, our task is straightforward: we ask whether the evidence, taken in the light most favorable to [Dr. Carter], would allow a reasonable factfinder to conclude that disability caused [his] termination." *Schoper v. Bd. of Trustees of Western Ill. Univ.*, 119 F.4th 527, 534 (7th Cir. 2024).

    Here, even assuming that Dr. Carter could establish that his prior substance abuse disorder qualifies as a disability under the ADA, as amended by the ADAAA, and that he was qualified to perform the essential functions of his position with or without reasonable accommodation, he has entirely failed to adduce evidence from which a reasonable jury could find that he was terminated because of his disability, to wit, that he was fired because of his prior substance abuse disorder. The Hospital's Substance Abuse Policy was unambiguously clear: Employee drug tests were to be evaluated by the Hospital's MRO, who was authorized to make a final determination as to whether any legitimate explanation for an employee's positive drug test existed beyond the use of illicit drugs. If the MRO determines that a positive test has no legitimate explanation, that determination

is final, and the Substance Abuse Policy provides that a positive drug test *will* result in termination.

Here, the underlying facts are undisputed: following a department-wide audit,[6] Dr. Carter voluntarily submitted to a drug test, which came back with a non-negative result for hydromorphone.  The MRO, who had never previously met Dr. Carter and had no knowledge of his prior substance abuse disorder, evaluated Dr. Carter's drug test, considered Dr. Carter's proffered explanation for the results, and determined that his explanation was not supported by medical evidence.  The MRO reported the positive drug test result to Mr. Johnson, and, pursuant to the Substance Abuse Policy, Dr. Carter was terminated.

Although Dr. Carter contends that he was never told of his right to have the sample retested, which he claims is evidence of pretext, he does not contend that the drug test result was inaccurate, such that a retest would have returned a different result, only that the MRO's interpretation of that result was incorrect.  Dr. Carter argues that he presented to the MRO evidence proving that his positive drug test could be explained by his valid prescription and that the MRO was wrong when she rejected his explanation.  While the proper scientific interpretation of Dr. Carter's drug test results is very clearly a disputed

---

[6] To the extent that Dr. Carter argues that the audit was prompted by false rumors about his "concerning behaviors" related to narcotics and was conducted only to target him, that argument is without factual underpinnings and thus unavailing.  The undisputed evidence establishes that the audit was conducted department-wide and the only two employees who were determined to have discrepancies above the Hospital's limit—Dr. Carter and a CRNA—were both drug-tested.  The CRNA's drug test results returned negative, so no further action was taken against him.  Dr. Carter raised no challenges to the audit at the time it was conducted and he voluntarily submitted to the drug test.  Accordingly, no reasonable jury could conclude that the circumstances surrounding the audit support Dr. Carter's claim of discrimination.

fact in this case, with each side presenting dueling expert testimony on the issue, it is not a *material* dispute because in the realm of employment law, the question "is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground." *Smiley v. Columbia College Chicago*, 714 F.3d 998, 1002–03 (7th Cir. 2013) (quoting *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006)). In other words, the "focus of the pretext inquiry is whether the proffered reason is a lie." *Id.* at 1002.

      Dr. Carter's case includes no such evidence of pretext. The MRO had no knowledge of Dr. Carter's prior substance abuse disorder and thus could not have been discriminating against him based on that fact when she certified his positive drug test. Hospital employees have no right under the Substance Abuse Policy to a second opinion of the MRO's determination nor does the Policy on its face provide Hospital's management any discretion once a positive drug test is returned to overturn the MRO's determination. While Dr. Carter argues that the Hospital should have sought a second opinion rather than rely solely on the MRO's determination, the court is not "a superpersonnel department that reexamines an entity's business decisions." *Cunningham v. Austin*, 125 F.4th 783, 789 (7th Cir. 2025) (quoting *Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir. 1999)).

      At best, Dr. Carter has adduced evidence showing that reasonable medical professionals could differ in their interpretations of his drug test results, but that fact alone does not render the Hospital's reliance on the MRO's determination illegitimate,

15

and Dr. Carter has adduced no other evidence to support a reasonable inference that the Hospital's failure to seek a second opinion was the result of discrimination. There is no evidence, for example, that the Hospital had on any previous occasion permitted any other employee to seek a second opinion of the MRO's determination; that the Hospital had ever before overturned the MRO's decision regarding another employee's certified positive drug test; or that the Hospital had disciplined any other employee with an MRO-certified positive drug test less severely than Dr. Carter.

    Nor is Dr. Carter's contention well-taken that Dr. Dunkle's alleged bias against him is evidence of discrimination. Specifically, Dr. Carter points to Dr. Dunkle's concern regarding drug-seeking behaviors allegedly exhibited by Dr. Carter in the weeks leading up to the department-wide audit, Dr. Dunkle's testimony that he would consider any hydromorphone showing up in an anesthesiologist's drug test "a red flag," and Dr. Dunkle's belief that the medical literature proffered by Dr. Carter regarding the metabolization of hydrocodone was outdated as evidence of discriminatory animus. However, Dr. Dunkle neither conducted the audit nor was he responsible for verifying Dr. Carter's drug test results. Thus, because Dr. Dunkle was not involved in any of the relevant decisions or processes, and the evidence is undisputed that the MRO's drug test certifications are final, there is no evidence that Dr. Dunkle's views did impact or could have impacted the termination decision in this case.

    Accordingly, no reasonable jury could find that Dr. Carter's disability was a but-for cause of the Hospital's decision to terminate him.

### III. Conclusion

For the reasons detailed above, Plaintiff's Motion for Summary Judgment [Dkt. 63] is <u>DENIED</u> and Defendant's Motion for Summary Judgment [Dkt. 68] is <u>GRANTED</u>. Final judgment shall enter accordingly.

    IT IS SO ORDERED.

Date:     2/11/2026

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Sandra L. Blevins
Betz & Blevins
sblevins@betzadvocates.com

Courtney E. Endwright
BETZ & BLEVINS
cendwright@betzadvocates.com

Lyndsay I. Ignasiak
Reminger Co. LPA
lignasiak@reminger.com